IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. __:____-CV-___-__

| | |
|---|---|
| ROBERT D. WHITE,<br><br>                                Plaintiff,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as Chief of Engineers and Commanding General, United States Army Corps of Engineers; MICHAEL L. CONNOR, in his official capacity as Assistant Secretary of the Army (Civil Works); and the UNITED STATES OF AMERICA,<br><br>                                Defendants. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.     This case challenges the "adjacent wetlands" provisions of the rule issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) (together, the "Agencies") purporting to interpret the term "navigable waters," for purposes of the Clean Water Act, 88 Fed. Reg. 3004 (Jan. 18, 2023), *as amended*, 88 Fed. Reg. 61,964 (Sept. 8, 2023) (the "Amended Rule"). The "adjacent wetlands" provisions of the Amended Rule are codified at 33 C.F.R. § 328.3(a)(4), (c)(2), and 40 C.F.R. § 120.2(a)(4), (c)(2).

2.     Plaintiff Robert D. White is a North Carolina landowner and businessman who has dedicated a lifetime of hard work to building a successful commercial seafood business. Seeking to ensure financial security for himself and his children, Mr. White has purchased during the past ten years or more a number of tracts of land in coastal Pasquotank County and surrounding areas.

3.     That hard work is now under serious threat. Mr. White finds himself unable to improve or develop multiple properties to their highest and best uses. And he finds himself subject to a financially devastating civil enforcement action brought by the United States government.

4.     The source of these threats to Mr. White's livelihood is the unlawful authority that two federal agencies—EPA and the Corps—have claimed to regulate land use pursuant to the Clean Water Act.

5.     The Clean Water Act regulates discharges of "pollutants" from "point sources" into "navigable waters," 33 U.S.C. §§ 1311(a), 1362(12)—defined as "the waters of the United States," *id.* § 1362(7). This definition functions as an absolute limitation on the Agencies' legal authority to regulate—the Agencies may regulate discharges to "navigable waters," but no further.

6.     For over fifty years, however, the Agencies have interpreted the term "navigable waters" not as a *limitation* upon their authority, but as a near limitless *grant* of authority to assert

control over enormous areas of private land in every corner of the country. In particular, the Agencies have steadily expanded the scope of their assertions of authority over private property by broadly—and implausibly—interpreting the term "navigable waters" to reach isolated wetlands and other dry land features.

7.  This is no small matter. Because the Act "can sweep broadly enough to criminalize mundane activities like moving dirt, this unchecked definition of 'the waters of the United States' means that a staggering array of landowners are at risk of criminal prosecution or onerous civil penalties." *Sackett v. EPA*, 598 U.S. 651, 669–70 (2023).

8.  In 2023, that steady expansion of agency authority was definitively brought to a halt by the United States Supreme Court.

9.  In *Sackett*, the Supreme Court unanimously rejected the Agencies' historically broad approach to wetlands regulation. A majority of the Court also set forth a clear and substantially narrowed standard for wetlands jurisdiction, derived from the plain text of the Act.

10.  According to this standard, the Agencies may only regulate (1) "those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (plurality opinion)); and (2) "wetlands" (i) with a "continuous surface connection" to such waters and (ii) that are "'as a practical matter indistinguishable from waters of the United States,' such that it is 'difficult to determine where the "water" ends and the "wetland" begins,'" *id.* at 678 (quoting *Rapanos*, 547 U.S. at 742)*.* If a wetland does not satisfy these conditions, it is, as a matter of law, not among the regulable "navigable waters."

11.     *Sackett*'s rejection of the Agencies' essentially limitless view of their own authority requires drastic revision to the Agencies' historically broad approach to wetlands regulation. Nevertheless—but perhaps as one might expect from two agencies "whose disregard for the statutory language has been so long manifested," *Rapanos*, 547 U.S. at 757 n.15 (plurality)—such revision has not been forthcoming.

12.     Instead, on September 8, 2023, the Agencies issued an amended rule purporting to redefine the scope of "navigable waters" in light of *Sackett*. *See* 88 Fed. Reg. 61,964.

13.     This Amended Rule does not comport with *Sackett*. Instead, the Amended Rule continues to assert staggeringly broad Clean Water Act authority over private land in every corner of the nation—in particular by continuing to assert authority over many types of isolated wetlands and other dry land. Among other material defects, the Amended Rule unlawfully omits *Sackett*'s "indistinguishability" requirement for wetlands to be subject to federal regulatory authority, *see* 40 C.F.R. § 120.2(a)(4)(ii); 33 C.F.R. § 328.3(a)(4)(ii), and instead relies on various asserted "connections" through intervening non-jurisdictional features, connections that lack surface water, and connections that are not "continuous" according to any plausible understanding of that word, *see* 88 Fed. Reg. at 3090–96.

14.     This Court must hold unlawful and set aside the Agencies' continued illegal regulation of private land. And it must restore the express, mandatory limitations on their authority established by *Sackett*.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 702, 704, 706 (judicial review of final agency action under the Administrative Procedure Act).

16.     This challenge to the Amended Rule is not one of the actions deemed by section 509(b) of the CWA, 33 U.S.C. § 1369(b)(1), to be exclusively within the jurisdiction of the courts of appeals, and therefore jurisdiction is proper in this Court. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 114 (2018).

17.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and to vacate unlawful agency action under 5 U.S.C. § 706.

18.     Plaintiff asserts that the Amended Rule constitutes *ultra vires*, unlawful, and arbitrary and capricious agency action. An actual, justiciable controversy exists between Plaintiff and Defendants.

19.     The federal government and the named Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

20.     Plaintiff directly and substantially is injured by the Amended Rule. Invalidation of the Amended Rule will redress those injuries.

21.     Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers, employees, and agencies of the United States and Plaintiff resides within the Eastern District of North Carolina. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act is generally proper in "a court of competent jurisdiction").

## DESCRIPTION OF PARTIES AND STANDING ALLEGATIONS

### Plaintiff

22.     **Robert D. White** is a North Carolina landowner and businessman. Mr. White resides in Elizabeth City, North Carolina.

23.     While building a successful commercial seafood business, Mr. White over time has purchased a number of additional parcels of land throughout Pasquotank County, Camden County,

and Chowan County. Much of this land is relatively low-lying and portions border the Pasquotank River, Big Flatty Creek, and other bodies of water.

24.     These lands are utilized for a variety of longstanding commercial purposes: as a base for Mr. White's seafood wholesale and retail distribution operations; for commercial and recreational fishing activities; for agricultural activities; for longer-term investments; and for many other potential future commercial activities.

25.     Because portions of these properties border various bodies of water, many of these lands contain bulkheads, piers, docks, boat basins, channels, buildings, Mr. White's home, and other improvements. As a result, these properties require regular maintenance and erosion control, which can raise questions of state and federal permitting jurisdiction. Accordingly, over many years Mr. White has applied for and obtained dozens of North Carolina Coastal Area Management Act ("CAMA") permits authorizing various maintenance, land clearing, construction, and erosion control activities.

26.     Mr. White purchased many of these lands as an investment in the future—to ensure financial security for himself and his children. To those ends, over time he has considered various options to further utilize these properties to their highest and best uses. This includes potential sales of the properties, potential further development, and continued operation of ongoing, lawful commercial activities on the properties.

27.     All possible future plans, as well as the basic value of Mr. White's properties, directly and immediately were placed in jeopardy when, on January 6, 2023, the United States sued him in this Court, alleging, among other things, that certain tracts of his farmland properties in Pasquotank County contain wetlands regulated as "navigable waters," and thus are subject to

the jurisdiction of EPA and the Corps, and that Mr. White violated the Act by discharging pollutants into "navigable waters."[1]

28.     All of Mr. White's property holdings and all possible future plans, and his very livelihood, were placed in further jeopardy on September 8, 2023, when the Agencies finalized the Amended Rule. That rule codifies an unlawfully broad view of the Agencies' authority and purports to establish jurisdiction over a wide range of wetland features that are not properly defined as "navigable waters" under the Clean Water Act or the Supreme Court's decision in *Sackett*.

29.     The Amended Rule—which represents the Agencies' controlling view of their own regulatory authority over wetlands in North Carolina—constitutes a direct federal regulation of Mr. White's properties and business activities, and has caused, and will continue to cause, significant economic injury to Mr. White.

30.     Because the Amended Rule is vague and expansive in describing features that are purportedly "navigable waters," and will require time-consuming, costly, and unpredictable case-by-case determinations, Mr. White does not and cannot know which features on his properties lawfully are covered by the Act's permitting requirements and which are not.

31.     Uncertainty as to which features are jurisdictional under the vague and extremely broad terms of the Amended Rule's "adjacent wetlands" provisions thus deprives Mr. White of notice of what the law requires of him and makes it impossible for him to make informed decisions concerning his current and potential future land uses and business activities.

32.     This lack of certainty as to what areas of his property might be regulated significantly injures Mr. White. "The CWA is a potent weapon. It imposes what have been

---

[1] This action followed various prior actions by the Agencies jeopardizing Mr. White's property interests and operations—including the issuance of various notices of violation, stop work orders, and restoration orders, under threat of civil or criminal prosecution.

described as 'crushing' consequences 'even for inadvertent violations.'" *Sackett*, 598 U.S. at 660

(quoting *Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 602 (2016) (Kennedy, J.,

concurring). A first-time criminal offense for even *negligently* discharging into "navigable waters"

without a permit is punishable by criminal penalties of up to $25,000 per violation per day, and up

to one year in prison per violation. 33 U.S.C. § 1319(c)(1). EPA may also impose civil penalties

of up to $64,618 per discharge, per day, per offense, without regard to any knowledge (or lack of

knowledge) of the jurisdictional status of a particular feature. 33 U.S.C. § 1319(g)(2)(A); 40 C.F.R.

§ 19.4.

33.     Mr. White has incurred, and will imminently incur, continuing economic costs due

to the Amended Rule, presenting him with no choice but to alter or halt his operations in order to

accommodate the possibility that his activities will be deemed discharges into wetlands later

determined by the Agencies to be jurisdictional "navigable waters."

34.     Likewise, the breadth and uncertainty of the Amended Rule's wetlands provisions

have required—and continue to require—Mr. White to expend extensive resources investigating

whether and to what extent his property is subject to Clean Water Act regulation under the

Amended Rule's definition of "adjacent wetlands." Given the broad and uncertain scope of the

Amended Rule, it is impossible for Mr. White to pursue any further plans, or make informed

decisions about his properties, without continuing to expend such resources to retain consultants,

legal counsel, and other professionals.

35.     These harms stemming from the Amended Rule's direct regulation of Mr. White's

property and land-use activities have caused Mr. White substantial economic injury, in at least

three specific ways.

36.     ***First***, Mr. White made plans to construct a sand mine on one of his Pasquotank County properties. At considerable expense he hired a consultant and ultimately secured the necessary permits from the North Carolina Department of Environmental Quality, Division of Energy, Mineral, and Land Resources, Land Quality Section. The permit was issued on June 22, 2016, and expires on June 22, 2026. The permit expressly authorizes Mr. White to disturb up to 46.4 acres of his property to construct and operate the mine. As a condition of the permit, Mr. White was required to post, and must maintain, a security bond in the amount of $88,100.00. Mr. White must also submit annual reports as a condition of the permit, and each year he pays a consultant to prepare these reports.

37.     As a result of the broad scope of authority asserted by the Agencies—as codified in the Amended Rule—the Agencies have specifically prohibited Mr. White, under threat of additional enforcement actions, from further developing and operating this lawfully permitted sand mine. This has been financially devastating. Each day the mine remains nonoperational, the permit's expiration in 2026 draws closer. With each day of non-operation, the chances increase that Mr. White may never recoup his substantial investment in the mine, much less derive any income or profit from it.

38.     ***Second***, Mr. White explored the possibility of constructing a fish-farming operation for reclamation purposes following retirement of the sand mine—specifically to farm crawfish and largemouth bass. Mr. White investigated markets and communicated with potential buyers throughout North Carolina for the sale of live seafood farmed on his property. However, because of the Agencies' broad view of their wetlands authority—as set forth in the Amended Rule—Mr. White has had no choice but to place further pursuit of these aquaculture plans on indefinite hold.

9

39.     ***Third,*** Mr. White is currently engaged in a crop-sharing arrangement with one or more local farmers on various portions of his properties. Under this arrangement, the farmers farm soybeans, corn, and wheat on several hundred acres across several of Mr. White's properties, paying Mr. White two-thirds of the profits from the sale of these commodities. However, to ensure compliance with the Agencies' broad view of their Clean Water Act authority—as set forth in the Amended Rule—Mr. White has had no choice but fallow certain areas of cultivated cropland and refrain from further improvements on these lands, thus diminishing future revenue derived from the crop-sharing arrangement. Moreover, Mr. White's inability to perform bulkheading and other erosion control measures on several of these properties, due to uncertainty in the Act's application as aggressively and unlawfully asserted by the Agencies, means that these farmlands continue to erode at high rates. In fact, Mr. White is losing arable farmland every day.

40.     Although each of these activities would constitute an otherwise lawful use of Mr. White's property, the Amended Rule presents him with no choice but to alter his plans to accommodate the possibility that one or more Defendants will deem these activities to constitute unlawful "discharges" of "pollutants" into wetlands determined by the Agencies to be "navigable waters."

41.     Mr. White is therefore presented with an impossible choice: (1) let his lands lay undeveloped and fallow and continue to erode—severely reducing his income from the properties and foreclosing him from further developing the best and highest uses of such lands; (2) engage in the time-consuming and expensive process of investigating the Agencies' potential claim of authority over his property, and then possibly engage in an even more time-consuming and expensive permitting process; or (3) face "'crushing' consequences 'even for inadvertent

violations.'" *Sackett*, 598 U.S. at 660 (quoting *Hawkes Co.*, 578 U.S. at 602 (Kennedy, J., concurring)).

42.    Mr. White would pursue the activities identified above—and many others—if not for the Agencies' unlawfully broad and vague approach to wetlands regulation, codified in the Amended Rule.

43.    Mr. White has forgone significant revenue already, with that figure mounting each day that the Agencies maintain the unlawfully broad view of their regulatory authority codified in the Amended Rule. These costs, and Mr. White's valuable time, are not recoverable.

44.    These injuries are traceable to the Amended Rule. Setting aside the Amended Rule and restoring the default of more limited federal wetlands regulation established by *Sackett* will redress these injuries.

45.    These harms exist in addition to and regardless of the United States' ongoing enforcement action against Mr. White. Many specific areas within which Mr. White wishes to pursue some or all of the above activities are not directly at issue in the ongoing enforcement action. And the majority of the properties owned by Mr. White are not implicated in that action at all. The bottom line is that, for as long as EPA and the Corps maintain the broad view of their own wetlands authority as set forth in the Amended Rule, Mr. White will be unable to use his properties according to their highest and best uses and must expend further resources to protect himself and attempt to ensure compliance with the Act as unlawfully interpreted by the Agencies.

46.    The current enforcement action, however, illustrates all too well the devastating consequences of the unlawful overreach by the Agencies. That action in and of itself has imposed extraordinary economic and personal costs upon Mr. White, and further heightened the regulatory risks associated with his otherwise lawful land-use activities. And notwithstanding *Sackett*'s

indistinguishability requirement for wetlands jurisdiction, and despite specific pleas for relief made by Mr. White after the landmark *Sackett* decision was issued, the United States has maintained an unmodified claim of authority over Mr. White's property through the enforcement action—even though any wetlands alleged to exist on Mr. White's property clearly are distinguishable from any waters otherwise subject to EPA and the Corps' authority under the Clean Water Act.

47.     Declaratory and injunctive relief would therefore redress the ongoing injuries Mr. White is suffering as a result of the enforcement action. The instant litigation seeks declaratory relief as to the Agencies' failure to comply with *Sackett*'s requirements for wetlands jurisdiction and will therefore clarify the rule of law governing the United States' authority to enforce the Act against Mr. White through the enforcement action.

### Defendants

48.     The ***United States Environmental Protection Agency*** is an agency of the United States government. EPA and its Administrator are charged with administering and enforcing many provisions of the Clean Water Act on behalf of the United States government. Along with the Corps, EPA promulgated the 2023 Rule and the Amended Rule.

49.     ***Michael S. Regan*** is the Administrator of EPA. Administrator Regan signed the 2023 Rule and the Amended Rule. He is sued in his official capacity.

50.     The ***United States Army Corps of Engineers*** is an agency of the United States government, within the United States Department of Defense. The Corps, the Assistant Secretary of the Army for Civil Works, and the Chief of Engineers and Commanding General of the Corps, are charged with administering and enforcing many provisions of the Clean Water Act on behalf

of the United States government. Along with EPA, the Corps promulgated the 2023 Rule and the Amended Rule.

51.     **Lieutenant General Scott A. Spellmon** is the Chief of Engineers and Commanding General for the United States Army Corps of Engineers. He is sued in his official capacity.

52.     **Michael L. Connor** is the Assistant Secretary of the Army for Civil Works. Assistant Secretary Connor signed the 2023 Rule and the Amended Rule. He is sued in his official capacity.

## LEGAL BACKGROUND AND FACTUAL ALLEGATIONS

*The Clean Water Act*

53.     As noted above, the Clean Water Act regulates discharges of "pollutants" from "point sources" to "navigable waters." 33 U.S.C. §§ 1311(a), 1362(12). The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Although the Act defines "territorial seas," *id.* § 1362(8), it does not define "the waters of the United States." *See id.*

54.     Nonexempt discharges to "navigable waters" require a permit from either EPA (called a National Pollutant Discharge Elimination Program, or NPDES, permit) or, if the discharge involves "dredged or fill material," from the Corps (commonly called a Section 404 permit). *See id.* §§ 1342(a), 1344(a).

55.     The Clean Water Act's permitting regime is a time-consuming, uncertain, and expensive process. *See Hawkes Co.*, 578 U.S. at 594–95 (observing that a Section 404 permit typically takes more than two years and $270,000 in consulting costs to secure).

56.     If obtained, a permit can result in significant changes to the applicant's intended operations and substantially limit the use of the property.

57.     Even a landowner merely wishing to establish the extent of agency authority over his property is faced with significant costs. Although Corps regulations provide a process for landowners to seek a determination as to the jurisdictional status of their property—a so-called "approved jurisdictional determination" (AJD), *see* 33 C.F.R. § 320.1(a)(6)—the AJD process is itself extraordinarily cumbersome and expensive, with no guarantee of success. Landowners often must retain experts at their own expense to determine federal jurisdiction over their property. *See Hawkes Co. v. U.S. Army Corps of Engineers*, 782 F.3d 994, 1003 (8th Cir. 2015) (Kelly, J., concurring) ("This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they even apply to you or your property.").

58.     Making matters worse are the draconian consequences for those who fail—even inadvertently—to run this regulatory gauntlet. *See Sackett*, 598 U.S. at 660. "Property owners who negligently discharge 'pollutants' into covered waters may face severe criminal penalties including imprisonment." *Id.* (citing 33 U.S.C. § 1319(c)). On the civil side, the Act "imposes over $60,000 in fines per day for each violation." *Id.* (citing Note following 28 U.S.C. § 2461; 33 U.S.C. § 1319(d)). Such penalties can easily accrue to hundreds of thousands, if not millions of dollars. *See id.* at 660–61 (citing Ninth Circuit's upholding of EPA's decision "to count each of 348 passes of a plow by a farmer through 'jurisdictional' soil on his farm as a separate violation." (citing *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 813, 818 (9th Cir. 2001), *aff'd by an equally divided Court*, 537 U.S. 99 (2002) (per curiam)).

59.     Further heightening the risks faced by the regulated public, the Act "also authorizes private plaintiffs to sue to enforce its requirements." *Id.* at 661 (citing 33 U.S.C. § 1365(a)).

14

*The Agencies' historically expansive view of their own authority*

60.     The significant costs and liabilities that the Clean Water Act can impose underscore the vital importance of clearly demarcating the Act's geographic reach—that is, the meaning of the term "navigable waters."

61.     Unfortunately, since the early days of the Act's implementation, EPA and the Corps have made it their mission to construe their own authority in the broadest and most vaguely opaque terms possible.

62.     Shortly after the Clean Water Act was passed, EPA and the Corps adopted regulations defining "navigable waters." 38 Fed. Reg. 13,528, 13,529 (May 22, 1973); 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974).

63.     EPA's interpretation was expansive, *see* 40 C.F.R. § 125.1(p)(2), (4), (6) (1974) (claiming authority over all "[t]ributaries" of navigable waters, as well as all "lakes, rivers, and streams" used by "interstate travelers" or used in interstate "industrial" commerce), whereas the Corps' was notably more limited. Guided by the Supreme Court's longstanding construction of the phrase "navigable waters of the United States," as it was employed in predecessor statutes, the Corps construed the Act principally to reach interstate waters that are navigable in fact or readily susceptible of being rendered so. *See Rapanos*, 547 U.S. at 723 (plurality opinion) (citing *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1871), and 39 Fed. Reg. at 12,119). In 1975, a federal district court rejected this interpretation as too narrow. *Natural Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975). The Corps did not appeal the ruling. Instead, following EPA's example, the Corps promulgated much broader regulations. *See Rapanos*, 547 U.S. at 724.

64.     These revised regulations—commonly known as the "1986 Regulations," *see* 88 Fed. Reg. at 3005 & nn.3–4—were meant to extend the scope of "navigable waters" to the outer

limits of Congress's power to regulate interstate commerce, *see Rapanos*, 547 U.S. at 724 (citing 42 Fed. Reg. 37,122, 37,144 n.2 (July 19, 1977)). Thus, federal permitting authority was asserted not just over interstate waters, but also intrastate waters with various relationships to interstate or foreign commerce, as well as all tributaries of such waters, and all "wetlands" that are "adjacent" to, *i.e.*, bordering, contiguous, or neighboring, any regulated water. 33 C.F.R. § 323.2(a)(2)–(5), (d) (1978). *See Rapanos*, 547 U.S. at 724.

***The Supreme Court weighs in—and the Agencies unlawfully construe the Court's narrow affirmance of their wetlands authority as license to expand their authority even further***

65.     The Supreme Court's first occasion to address the Agencies' authority under the Act came in 1985. *See United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985).

66.     In *Riverside Bayview*, the Court concluded that the Agencies could permissibly regulate those wetlands that are "inseparably bound up with the 'waters' of the United States." *Id.* at 134.

67.     At the same time, the Court cautioned that its affirmance of the Agencies' authority was limited to the regulation of such inseparably bound-up wetlands. *See id.* at 131 & n.8.

68.     The Agencies "responded to *Riverside Bayview* by expanding their interpretations even further." *Sackett*, 598 U.S. at 665.

69.     For example, they claimed authority over isolated waters used by migratory birds, pursuant to the so-called "Migratory Bird Rule," *Rapanos*, 547 U.S. at 725 (plurality opinion) (citing 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)), as well as "ephemeral streams" and "drainage ditches" with an "ordinary high water mark," *id.* (citing 65 Fed. Reg. 12,818, 12,823 (Mar. 9, 2000)).

***The Supreme Court cabins the Agencies' authority—but they are undeterred***

70.     The Agencies found their way back to the Supreme Court in 2001.

71.     In *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Court rebuffed the Agencies' attempt to regulate "nonnavigable, isolated, intrastate waters"—pursuant to the so-called Migratory Bird Rule—as contrary to the Clean Water Act.

72.     The Court emphasized that the Agencies' assertion of authority could not be squared with *Riverside Bayview*'s requirement that wetlands and waters be "inseparably bound up," *id.* at 167–68 (quoting *Riverside Bayview*, 474 U.S. at 134), nor with the Act's preservation of the States' important role in regulating land and water, *id.* at 174 (citing 33 U.S.C. § 1251(b)).

73.     Additionally, the Court noted that the Agencies' interpretation ignored Congress's use of the word "navigable," which "has at least the import of showing us what Congress had in mind as its authority for enacting the [Clean Water Act]: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 172.

74.     The Court therefore invalidated the Agencies' assertion of authority over the isolated ponds at issue.

75.     Undeterred, and mere "[d]ays" after the Supreme Court issued its decision, the Agencies "issued guidance that sought to minimize *SWANCC*'s impact." *Sackett*, 598 U.S. at 666. *See also Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) ("Rather than refining its view of its authority in light of our decision in *SWANCC* . . . the Corps chose to adhere to its essentially boundless view of the scope of its power.").

*The Supreme Court cabins the Agencies' authority again—they still remain undeterred*

76.     In 2006, the Agencies found their way to the Supreme Court again.

77.     In *Rapanos v. United States*, 547 U.S. 715 (2006), five members of the Court held the Agencies' 1986 Regulations to be invalid insofar as they purport to regulate all tributaries of traditionally navigable waters and all wetlands adjacent to such tributaries. *Id.* at 728 (plurality opinion); *id.* at 759 (Kennedy, J., concurring in the judgment). But no opinion explaining why the Act cannot be so construed garnered a majority of the Court.

78.     Writing for himself and three other members of the Court, Justice Scalia began his analysis by noting that, however the qualifiers "navigable" and "of the United States" may limit the Act's scope, that scope can extend no further than "waters." *Id.* at 731 (plurality opinion). Justice Scalia then proceeded to explain, based on (i) an ordinary meaning analysis of the statutory text, (ii) the Court's rulings in *Riverside Bayview* and *SWANCC*, and (iii) Congress's desire to preserve traditional state authority over land and water, *see id.* at 732–38, that "waters" include "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes,'" *id.* at 739 (quoting Webster's New International Dictionary 2882 (2d ed. 1954)).

79.     "Wetlands" would not normally fall under such a definition. *See Riverside Bayview*, 474 U.S. at 132. But as Justice Scalia pointed out, there is a difference between considering a wetland on its own to be a "water," and concluding that inevitably some wetlands may be regulated as "waters" given the "inherent ambiguity in drawing the boundaries of any 'waters.'" *Rapanos*, 547 U.S. at 740 (plurality opinion).

80.     Thus, "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between

'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id*. at 742. Put another way, the surface-water connection must be so substantial that the wetland and abutting water are rendered "*indistinguishable*." *Id.* at 755.

81. Although Justice Kennedy provided the fifth vote to support the Court's judgment rejecting the Agencies' expansive regulation, he disagreed with the plurality's rationale for that rejection. *Id.* at 759 (Kennedy, J., concurring in the judgment).

82. Instead of a boundary-drawing test for determining when a wetland may be deemed a "water," Justice Kennedy proposed a "significant nexus" standard. *Id*. According to this rule, a wetland may be regulated if it, either alone or in combination with other "similarly situated" wetlands in the "region," significantly affects the physical, chemical, and biological integrity of "waters more readily understood as 'navigable.'" *Id.* at 780.

83. The Agencies were still not deterred. "In the decade following *Rapanos*, the EPA and the Corps issued guidance documents that 'recognized larger grey areas and called for more fact-intensive individualized determinations in those grey areas.'" *Sackett*, 598 U.S. at 667. (citation omitted)).

***The Agencies repeatedly fail to define their own authority in a manner the satisfies the Clean Water Act and survives judicial review***

84. During the seventeen years following *Rapanos*, the Agencies—with limited exception, *see* 85 Fed. Reg. 22,250 (Apr. 21, 2020) (the "2020 Rule")—relied upon a series of broadly formulated versions of the "significant nexus test" to continue ratcheting up their own authority, *see* EPA & Army Corps, Memorandum re: Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec.

2008) (the "Post-*Rapanos* Guidance");[2] 80 Fed. Reg. 37,054 (June 29, 2015) (the "2015 Rule");

84 Fed. Reg. 56,626 (Oct. 22, 2019) (the "2019 Rule"); 88 Fed. Reg. 3004 (the "2023 Rule").

85.     Shortly after *Rapanos*, EPA and the Corps issued a guidance document purporting

to explain how federal Clean Water Act jurisdiction was to be established. This Post-*Rapanos*

Guidance articulated a hodge-podge test, taking some aspects from the *Rapanos* plurality and some

from Justice Kennedy's concurrence.

86.     The Post-*Rapanos* Guidance also stated that, by its own terms, it did "not impose

legally binding requirements on EPA, the Corps, or the regulated community, and may not apply

to a particular situation depending on the circumstances." *See* Post-*Rapanos* Guidance at 4 n.17.

87.     The Post-*Rapanos* Guidance guided nobody. *See* 80 Fed. Reg. at 37,056 ("[The]

guidance documents did not provide the public or agency staff with the kind of information needed

to ensure timely, consistent, and predictable jurisdictional determinations.").

88.     Recognizing that failure, the Agencies then embarked upon notice-and-comment

rulemaking, resulting in the 2015 so-called Clean Water Rule, 80 Fed. Reg. 37,054. The 2015 Rule

used the significant nexus test as a starting point to assert "sweeping[ly]" broad authority over all

manner of features, wet or otherwise—"a muscular approach that would subject 'the vast majority

of the nation's water features' to a case-by-case jurisdictional analysis." *Sackett*, 598 U.S. at 668.

89.     The 2015 Rule was preliminarily enjoined within just a few months of its adoption.

*In re EPA & Dep't of Defense Final Rule*, 803 F.3d 804 (6th Cir. 2015), *vacated on other grounds*,

*In re U.S. Dep't of Defense*, 713 Fed. App'x 489 (6th Cir. 2018); *North Dakota v. U.S. EPA*, 127

F. Supp. 3d 1047 (D.N.D. 2015). Ultimately, two other courts held on the merits that the rule was

---

[2] *Available at* https://perma.cc/JNN9-HKEG.

unlawful. *See Texas v. U.S. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019).

90.     Following these adverse rulings, the Agencies repealed the 2015 Rule and reinstated the prior regulations at issue in *Rapanos* defining "navigable waters." *See* 84 Fed. Reg. 56,626.

91.     The Agencies then tried rulemaking again, issuing in 2020 the so-called Navigable Waters Protection Rule. *See* 85 Fed. Reg. 22,250.

92.     This third agency effort at construing *Rapanos* failed as well, with one district court preliminarily enjoining it shortly after its issuance, *Colorado v. U.S. EPA*, 445 F. Supp. 3d 1295, 1312 & n.11 (D. Colo. 2020), *rev'd and vacated on other grounds*, 989 F.3d 874 (10th Cir. 2021), and two other courts vacating it, *see Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949, 955–56 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164 (D.N.M. 2021).

93.     And then, on January 24, 2022, the Supreme Court granted certiorari in *Sackett v. EPA*—a case involving an assertion of Clean Water Act authority over alleged wetlands on a residential lot near Priest Lake, Idaho. *See Sackett v. EPA*, 142 S. Ct. 896 (2022).

94.     *Sackett* promised to resolve the post-*Rapanos* quandary once and for all—the Court granted certiorari to determine the "proper test for determining whether wetlands [are] 'waters of the United States' under the Clean Water Act, 33 U.S.C. § 1362(7)." *Id.*

**The Agencies prematurely issue the 2023 Rule—and fail again**

95.     Notwithstanding their dismal post-*Rapanos* track record and *Sackett's* promise of much-needed guidance, on January 18, 2023, the Agencies tried yet again to define "navigable waters" through rulemaking. *See* 88 Fed. Reg. 3004.

96. Predictably, that 2023 Rule—issued on the eve of the Supreme Court's decision in *Sackett*—expanded the Agencies' authority even further.

97. It allowed for wetlands regulation pursuant to a test superficially inspired by Justice Scalia's *Rapanos* plurality—what the Agencies termed the "relatively permanent standard." *Id.* at 3004–07. But it primarily relied upon a "significant nexus standard"—superficially inspired by Justice Kennedy's *Rapanos* concurrence. *Id.*

98. More generally, the 2023 Rule broadly asserted agency authority—with limited exceptions—over five categories of land and water:

(1) Traditional navigable waters, territorial seas, and interstate waters ("paragraph (a)(1) waters");

(2) Impoundments of "waters of the United States" ("paragraph (a)(2) impoundments");

(3) Tributaries to traditional navigable waters, territorial seas, interstate waters, or impoundments, where those tributaries meet either the relatively permanent or significant nexus standard ("jurisdictional tributaries" or "paragraph (a)(3) tributaries");

(4) Wetlands that are adjacent to:
   a. Traditional navigable waters, territorial seas, and interstate waters;
   b. Relatively permanent impoundments or tributaries, where the wetlands bear a continuous surface connection with those impoundments or tributaries; or
   c. Non-relatively permanent impoundments and tributaries where the wetlands meet the significant nexus standard.

(5) Other intrastate lakes, ponds, streams, or wetlands that meet either the relatively permanent or significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

*See* 88 Fed. Reg. at 3142–44, *codified at* 33 C.F.R. § 328.3; 40 C.F.R. § 120.2 (2023).

99. While these categories—permitting wetlands regulation pursuant to a so-called "relatively permanent" standard and a so-called "significant nexus" standard—bore some passing resemblance to the two tests set forth in *Rapanos*, the Agencies were explicit that they were not

applying either test as set forth in that opinion. *See* 88 Fed. Reg. at 3021 ("[W]hile the agencies' interpretation of the statute is informed by Supreme Court decisions, including *Rapanos*, it is not an interpretation of the multiple opinions in *Rapanos* . . . .").

100.    Rather, the Agencies purported to be codifying their "interpretation of 'navigable waters' informed by the text of the relevant provisions of the Clean Water Act and the statute as a whole, as well as the scientific record, relevant Supreme Court case law, input from public comment, and the agencies' experience and technical expertise. . . ." *Id.* at 3021–22.

101.    Indeed, the 2023 Rule went far beyond anything contemplated by either of the principal opinions in *Rapanos*. *See Texas v. U.S. EPA*, 662 F. Supp. 3d 739, 753 (S.D. Tex. 2023) ("[T]he Rule is unlikely to withstand judicial review because its version of the significant-nexus test is materially different from the standard Justice Kennedy articulated in *Rapanos*."); *West Virginia v. U.S. EPA*, 669 F. Supp. 3d 781, 802 (D.N.D. 2023) ("Even tributaries that 'may run dry [for] years' can be treated as relatively permanent." (quoting 88 Fed. Reg. at 3085)); *id.* at 802 (noting that by "redefin[ing] 'continuous surface connection' to cover waters that lack even minimal 'constant hydrologic connection,'" the Agencies have rendered even the most "remote" of wetlands "arguably [] covered under the 2023 Rule.").

102.    The Agencies also failed to meaningfully define "relatively permanent" waters for purposes of the 2023 Rule's *Rapanos*-plurality-inspired test. Instead, they assumed that such waters would be generally jurisdictional under the 2023 Rule's "significant nexus"-inspired test, and that inclusion of such waters was therefore largely a matter of administrative convenience for determining jurisdiction under the broader "significant nexus standard." *See* 88 Fed. Reg. at 3034 ("The relatively permanent standard is administratively useful as it more readily identifies a subset of waters that will virtually always significantly affect paragraph (a)(1) waters[.]"). Indeed, the

23

Agencies explicitly dismissed the "relatively permanent" test as a standalone basis for jurisdiction, due to their (since confirmed to be incorrect) belief that the "relatively permanent standard . . . is inconsistent with the Act's text and objective." *Id.* at 3039.

103.    The 2023 Rule lasted no longer than its predecessors: it was preliminarily enjoined in Texas and Idaho on March 19, 2023, *Texas*, 662 F. Supp. 3d 739; in twenty-four additional states on April 12, 2023, *West Virginia*, 669 F. Supp. 3d 781; and in Kentucky and nationwide as to the individual members of the Kentucky Chamber of Commerce, United States Chamber of Commerce, Associated General Contractors of Kentucky, Home Builders Association of Kentucky, Portland Cement Association, and the Georgia Chamber of Commerce, on May 10, 2023, *Kentucky v. EPA*, Nos. 23-5343 and 23-5345 (6th Cir. May 10, 2023), ECF No. 24. None of these injunctions apply to Mr. White's properties in North Carolina.

104.    In the view of these courts, the 2023 Rule suffered from what had become a persistent problem for the Agencies: it construed their Clean Water Act authority in an egregiously overbroad manner. *See West Virginia*, 669 F. Supp. 3d at 801 ("Beyond the many problems with the new 2023 Rule recognized by the considered decision of the federal district court in Texas, this Court is of the opinion the 2023 Rule raises a litany of other statutory and constitutional concerns.").

***The Supreme Court unanimously rebukes the Agencies—and a majority of the Supreme Court sets forth a clear test for agency authority***

105.    On May 25, 2023, the Supreme Court issued its decision in *Sackett. See* 598 U.S. 651.

106.    In *Sackett*, the Supreme Court unanimously rejected the significant nexus test, and unanimously rejected the Agencies' claim of authority over the parcel of land at issue in that case.

107.    In addition, the majority set forth a clear test for wetlands jurisdiction derived from the Clean Water Act's plain text.

108.    First, the Court held "that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as 'streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739) (internal quotations omitted).

109.    Second, as to wetlands, the Court held that:

> "waters" may fairly be read to include only those wetlands that are "as a practical matter indistinguishable from waters of the United States," such that it is "difficult to determine where the 'water' ends and the 'wetland' begins." That occurs when wetlands have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands."

*Sackett*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742, 755 (plurality opinion)).

110.    *Sackett's* bottom line is that regulable wetlands "must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Id.* at 676. And "[w]etlands that are separate from traditional navigable waters cannot be considered part of those waters, even if they are located nearby." *Id.*

111.    Additionally, the Court expressed deep concern with the separation of powers, federalism, and due process implications of the Agencies' virtually limitless view of their own authority. *See id.* at 674–77, 681–82.

**Still undeterred, the Agencies issue the Amended Rule**

112.    *Sackett's* unanimous rejection of the significant nexus test—the Agencies' predominant approach for the better part of seventeen years, *see* Post-*Rapanos* Guidance; 80 Fed. Reg. 37,054; 84 Fed. Reg. 56,626; 88 Fed. Reg. 3004—and the majority's robust rejection of the

Agencies' limitless view of their own authority, naturally should have required drastic revision to the Agencies' historical approach to wetlands regulation.

113.    Such revision has not been forthcoming. Instead, on September 8, 2023, the Agencies issued an amended version of the 2023 Rule, purporting to bring that fatally defective rule into compliance with *Sackett*. *See* 88 Fed. Reg. 61,964.

114.    The Agencies represent that "the sole purpose of [the Amended Rule] is to amend the[] specific provisions of the 2023 Rule to conform with *Sackett*." *Id.* at 61,964–65. To that end, the Amended Rule severs those provisions of the 2023 Rule codifying the significant nexus test, while leaving the remainder of the rule intact.

115.    Now, the Agencies assert authority over:

(1)    traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");

(2)    impoundments of "waters of the United States" ("paragraph (a)(2) impoundments");

(3)    tributaries to traditional navigable waters, the territorial seas, interstate waters, or impoundments when the tributaries meet the relatively permanent standard ("jurisdictional tributaries" or "paragraph (a)(3) tributaries");

(4)    wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments or (a)(3) tributaries; and

(5)    intrastate lakes and ponds not identified in paragraphs (a)(1) through (4) that meet the relatively permanent standard and have a continuous surface connection to (a)(1) or (a)(3) waters ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

*See* 88 Fed. Reg. at 61,968–69, *codified at* 33 C.F.R. § 328.3; 40 C.F.R. § 120.2.

116.    As to wetlands in particular, the Amended Rule authorizes regulation of wetlands "adjacent to" other covered waters. 33 C.F.R. § 328.3(a)(4); 40 C.F.R. § 120.2(a)(4). It defines

"adjacent" as "having a continuous surface connection." 33 C.F.R. § 328.3(c)(2); 40 C.F.R. § 120.2(c)(2)).

117.    The Amended Rule's preamble is sparse. Thus, those portions of the unamended 2023 Rule's preamble explaining the Agencies' approach to the "relatively permanent test" for wetlands authority still generally govern the Agencies' implementation of the Act. *See* Joint Coordination Memo. to the Field Between the U.S. Dep't of the Army, U.S. Army Corps of Eng'rs & the U.S. Env't Prot. Agency 1 (Sept. 27, 2023) ("Because the Supreme Court in *Sackett* adopted the *Rapanos* plurality standard and the 2023 rule preamble discussed the *Rapanos* plurality standard, the implementation guidance and tools in the 2023 rule preamble that address the regulatory text that was not amended by the conforming rule . . . generally remain relevant to implementing the 2023 rule, as amended.").[3]

***The adjacent wetlands provisions of the Amended Rule are illegal***

118.    The "adjacent wetlands" provisions of the Amended Rule, 33 C.F.R. § 328.3(a)(4), (c)(2); 40 C.F.R. § 120.2(a)(4), (c)(2), are contrary to, and in excess of, the Clean Water Act's grant of authority to the Agencies to regulate "navigable waters," defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

119.    The Amended Rule asserts authority over wetlands adjacent to relatively permanent bodies of water to which the wetland has "a continuous surface connection." 40 C.F.R. § 120.2(a)(4)(ii); 33 C.F.R. § 328.3(a)(4)(ii). *See also* 88 Fed. Reg. at 61,968–69 ("Adjacent means having a continuous surface connection.").

120.    But this standard omits a key requirement of *Sackett*: that the continuously connected wetland and water also be "indistinguishable," so "that there is no clear demarcation

---

[3]    *Available at* https://www.epa.gov/system/files/documents/2023-10/2023-joint-coordination-memo-amended-2023-rule_508c.pdf.

between 'waters' and 'wetlands.'" *Sackett*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742). *See also id.* at 676 ("In other words, the[] [wetland] must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA."); *id.* at 684 ("the CWA extends to only those 'wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right,' *so that they are 'indistinguishable' from those waters*," 598 U.S. at 684 (quoting *Rapanos*, 547 U.S. at 742) (emphasis added)).

121.    By defining "navigable waters" as covering "wetlands with a continuous surface connection" to a covered water, 40 C.F.R. § 120.2(a)(4)(ii); 33 C.F.R. § 328.3(a)(4)(ii), but failing to include the requirement that such wetlands be "indistinguishable" from those waters, *Sackett*, 598 U.S. at 684, the Amended Rule regulates far beyond what *Sackett* allows.

122.    Indeed, those portions of the preamble to the 2023 Rule pertaining to this so-called "relatively permanent test"—which remain generally operative—make explicit that the Agencies do not consider their authority to be limited by *Sackett*'s indistinguishability requirement.

123.    For example, despite the touchstone of *Sackett*'s test being a "difficult[y]" in "determin[ing] where the 'water' ends and the 'wetland' begins," *Sackett*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742), the Agencies contend that the connection between water and wetland need not be aquatic. 88 Fed. Reg. at 3095. *See also id.* at 3096 (noting that continuous surface connection test "does not require surface water to be continuously present between the wetland and the tributary"); *contra Sackett*, 598 U.S. at 678 (contemplating a surface water connection except for "temporary interruptions . . . because of phenomena like low tides or dry spells").

124.    The Agencies further contend that, even after *Sackett*, they may still assert authority by mapping an attenuated connection between a wetland and a "water" through "a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert." 88 Fed. Reg. at 3090, 3095, 3096.

125.    And most egregiously, the Agencies maintain that a continuous surface connection may even be present where a natural or artificial physical barrier separates a wetland from a covered water. *See id.* at 3090 ("A natural berm, bank, dune, or similar natural landform between an adjacent wetland and a relatively permanent water does not sever a continuous surface connection to the extent it provides evidence of a continuous surface connection."); *id.* at 3095–96 (explaining that an artificial barrier does not sever jurisdiction where it permits flow through culverts, pipes, or waterfalls). The Agencies advance this position despite *Sackett*'s holding that, unless constructed illegally, "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction . . . ." *Sackett*, 598 U.S. at 678 n.16.

126.    More broadly, the Agencies' insistence on continuing to regulate enormous areas of land that can be readily distinguished from covered waters gives rise to the same constitutional concerns that motivated the Supreme Court to reject EPA's position in *Sackett*.

127.    ***First***, the Amended Rule asserts direct federal control over enormous areas of private property in every corner of the country—and all manner of beneficial private economic activities—despite the admonishment of the Supreme Court that it "expect[s] Congress to speak clearly" when authorizing an agency to exercise powers of "vast economic and political significance." *West Virginia v. U.S. EPA*, 597 U.S. 697, 716 (2022). In the absence of such a clear statement, the Agencies necessarily lack the authority they claim. *See id.*

128.    All the Agencies can point to for their broad assertion of authority to regulate private land is their authority to regulate "navigable waters," defined as the "waters of the United States." 33 U.S.C. § 1362(7). To interpret these terms as permitting such broad authority runs afoul of the major questions doctrine. *See West Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle

device[s].'" (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001))). *Cf.*

*Sackett*, 598 U.S. at 677 ("Congress does not 'hide elephants in mouseholes' by 'alter[ing] the

fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" (quoting

*Whitman*, 531 U.S. at 468)); *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th

291, 296–302 (4th Cir. 2023) (applying the major questions doctrine in the context of the Clean

Water Act).

129.     **Second**, the Amended Rule stretches the Agencies' authority to the outer limits of

Congress's power under the Commerce Clause. Yet, "[w]here an administrative interpretation of

a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress

intended that result." *SWANCC*, 531 U.S. at 172. The Agencies have not pointed, and cannot point,

to any such clear statement. *Cf. Sackett*, 598 U.S. at 674 ("It is hard to see how the States' role in

regulating water resources would remain 'primary' if the EPA had jurisdiction over anything

defined by the presence of water.").

130.     **Third**, the Agencies' determined position that the Act permits them to regulate—

and thus impose civil and criminal liability for activities occurring within—an array of isolated

wetland features, pursuant only to a vaguely defined "continuous surface connection" test, raises

serious due process concerns. The Agencies contend that they may ascertain a "continuous surface

connection" in numerous ways that cannot be readily discerned by the regulated public, 88 Fed.

Reg. at 3093–95—thus reaching all manner of land-use activities that one could not possibly know

are subject to the Agencies' authority. Such an interpretation cannot be sustained. *Cf. Sackett*, 598

U.S. at 680–81 ("Due process requires Congress to define penal statutes 'with sufficient

definiteness that ordinary people can understand what conduct is prohibited' and 'in a manner that

does not encourage arbitrary and discriminatory enforcement.'" (quoting *McDonnell v. United*

*States*, 579 U.S. 550, 576 (2016))); *id.* at 681–82 ("Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities, we have been wary about going beyond what 'Congress certainly intended the statute to cover.'" (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010))).

131.   Indeed, the Agencies' failure to heed *Sackett*'s clear requirements perpetuates the intolerable situation observed in *Sackett* whereby property owners—"[f]acing severe criminal sanctions for even negligent violations"—"are left to feel their way on a case-by-case basis." *Sackett*, 598 U.S. at 681 (quoting *Sackett v. EPA*, 566 U.S. 120, 124 (2012) (internal quotations omitted)).

132.   The Agencies' insistence on maintaining authority over wetlands that can be readily distinguished from other covered waters is untenable. The Agencies' failure to give effect to *Sackett*'s basic, limiting requirements renders the Amended Rule contrary to, and in excess of, the authority granted to them in the Act.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

133.   Plaintiff incorporates herein by reference the allegations set forth in the preceding paragraphs.

134.   Plaintiff has been injured by the Amended Rule. If an injunction is not issued against Defendants' implementation and enforcement of the Amended Rule, Plaintiff will be irreparably harmed. Harm to Plaintiff attributable to the Amended Rule includes but is not limited to economic and non-economic harm stemming from the Amended Rule's unlawfully restricting Plaintiff's productive use, enjoyment, and improvement of his land. The Amended Rule is severely affecting Plaintiff's otherwise lawful day-to-day land use and business activities.

135.    Plaintiff has no plain, speedy, and adequate remedy at law for these injuries. Damages in this case are not available.

136.    The Amended Rule is a "final agency action" within the meaning of 5 U.S.C. § 704 and is therefore immediately subject to challenge in this Court.

137.    Plaintiff's claims for relief are ripe.

138.    If not enjoined by the Court, Defendants will continue to enforce or rely on the Amended Rule in derogation of Plaintiff's rights and interests.

139.    Accordingly, an actual and substantial controversy exists between Plaintiff and Defendants as to their legal rights and duties with respect to the Amended Rule.

140.    This case is justiciable because the Agencies' unlawful issuance of the Amended Rule is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Plaintiff. Because the Amended Rule has directly imposed substantial regulatory burdens on the economically beneficial use of Plaintiff's property and on Plaintiff's day-to-day activities, Plaintiff has a significant interest in knowing whether the Amended Rule, to which he is subject, is statutorily valid.

141.    Therefore, declaratory and injunctive relief is appropriate to resolve this controversy.

**FIRST CLAIM FOR RELIEF**
*The Amended Rule is arbitrary, capricious, an abuse*
*of discretion, or otherwise not in accordance with law*
**(Violation of the APA, 5 U.S.C. § 706(2)(A))**

142.    Plaintiff incorporates herein by reference the allegations set forth in the preceding paragraphs.

143. The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144. The Clean Water Act authorizes the Agencies to exercise authority only as to "navigable waters," defined as "the waters of the United States." 33 U.S.C. §§ 1311(a), 1342(a), 1344(a), 1362(7), (12).

145. In *Sackett*, the Supreme Court made clear that the Agencies may only regulate (1) "those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739 (plurality opinion)); and (2) "wetlands" (i) with a "continuous surface connection" to such waters and (ii) that are "'as a practical matter indistinguishable from waters of the United States,' such that it is 'difficult to determine where the "water" ends and the "wetland" begins,'" *id.* at 678 (quoting *Rapanos*, 547 U.S. at 742 (plurality opinion)). If a wetland does not satisfy these conditions, it is, as a matter of law, not among the regulable "waters of the United States."

146. The Amended Rule omits *Sackett*'s "indistinguishability" requirement for wetlands, *see* 40 C.F.R. § 120.2(a)(4)(ii); 33 C.F.R. § 328.3(a)(4)(ii), instead relying on connections through non-jurisdictional features, connections that lack water, and connections that are not "continuous" based on any plausible understanding of the word, *see* 88 Fed. Reg. 3090–96.

147. Hence, the "adjacent wetlands" provisions of the Amended Rule, 33 C.F.R. § 328.3(a)(4), (c)(2); 40 C.F.R. § 120.2(a)(4), (c)(2), contravene *Sackett*'s test for federal

wetlands authority, and as a result are inconsistent with, and contrary to, the plain requirements of the Clean Water Act, 33 U.S.C. § 1362(7).

148.     By these acts or omissions, the Agencies violated the APA, 5 U.S.C. § 706(2)(A). Therefore, the Amended Rule is invalid and must be set aside.

## SECOND CLAIM FOR RELIEF
*The adjacent wetlands provisions of the Amended Rule are in excess*
*of statutory jurisdiction, authority, or limitations, or short of statutory right*
**(Violation of APA, 5 U.S.C. § 706(2)(C))**

149.     Plaintiff incorporates herein by reference the allegations set forth in the preceding paragraphs.

150.     The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that exceeds statutory authority. 5 U.S.C. § 706(2)(C).

151.     For the reasons articulated above at Paragraphs 144–46, the "adjacent wetlands" provisions of the Amended Rule, 33 C.F.R. § 328.3(a)(4), (c)(2); 40 C.F.R. § 120.2(a)(4), (c)(2), contravene *Sackett*'s test for federal wetlands authority, and as a result exceed the Clean Water Act's limited grant of authority for the Agencies to regulate "navigable waters," defined as "the waters of the United States." 33 U.S.C. § 1362(7).

152.     Further, when an agency claims broad authority to exercise powers of "vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 716, 723 (quoting *Util. Air Regul. Grp. v. U.S. EPA*, 573 U.S. 302, 324 (2014)). In the absence of such a clear statement, the agency necessarily lacks the authority it claimed. *See id.*

153.     The "adjacent wetlands" provisions of the Amended Rule assert federal control over enormous areas of private property, and all manner of beneficial private economic activity,

forcing landowners to obtain costly permits or face severe civil and criminal liability for ordinary uses of their land.

154.    The Amended Rule therefore concerns an issue of vast economic and political significance.

155.    The Agencies have identified no clear statement authorizing them to exercise this sweeping power.

156.    By these acts or omissions, the Agencies violated the APA, 5 U.S.C. § 706(2)(C). Therefore, the Amended Rule is invalid and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

**As to the First Claim for Relief:**

1.    Declare that the "adjacent wetlands" provisions of the Amended Rule, 40 C.F.R. § 120.2(a)(4), (c)(2); 33 C.F.R. § 328.3(a)(4), (c)(2), are unlawful because, in issuing them, the Agencies acted arbitrarily and capriciously, abused their discretion, or otherwise failed to act in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

**As to the Second Claim for Relief:**

2.    Declare that the "adjacent wetlands" provisions of the Amended Rule, 40 C.F.R. § 120.2(a)(4), (c)(2); 33 C.F.R. § 328.3(a)(4), (c)(2), are unlawful because they were issued in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the APA, 5 U.S.C. § 706(2)(C).

**As to both Claims for Relief:**

3.    Set aside the Amended Rule.

4.      Preliminarily and permanently enjoin the implementation and enforcement of the Amended Rule.

5.      Remand the Amended Rule for further rulemaking consistent with this Court's opinion.

6.      Award Plaintiff reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other appropriate authority; and

7.      Award Plaintiff any other relief the Court deems just and proper under the circumstances of this case.

DATED: March 14, 2024.

Respectfully submitted,

/s/ Charles T. Yates
CHARLES T. YATES*
Cal. Bar No. 327704
DAMIEN M. SCHIFF*
Cal. Bar No. 235101
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111
CYates@pacificlegal.org
DSchiff@pacificlegal.org

PAIGE E. GILLIARD*
Cal. Bar No. 330051
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 888-6881
PGilliard@pacificlegal.org

/s/ I. Clark Wright, Jr.
I. Clark Wright, Jr.
N.C. Bar No. 11163
Davis Hartman Wright LLP
209 Pollock Street
New Bern, NC 28560
(252) 262-7054 (O)
(252) 229-5900 (Cell - preferred)
icw@dhwlegal.com
*Local Civil Rule 83.1(d)*
*Attorney for Plaintiff*


**Notice of Special Appearance Forthcoming*

*Attorneys for Plaintiff Robert D. White*