IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:24-CV-00013-BO

ROBERT D. WHITE                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )          O R D E R
                                         )
UNITED STATES ENVIRONMENTAL              )
PROTECTION AGENCY, *et al.*,             )
                                         )
                    Defendant.           )


This case is about "adjacent" wetlands and their place within the "waters of the United States" as those terms are understood in the Clean Water Act (CWA or the Act). 33 U.S.C. § 1251 *et seq.* Last year in *Sackett v. EPA*, 598 U.S. 651 (2023), the Supreme Court narrowed the scope of wetlands considered "adjacent" to "waters of the United States" and thus federally regulable under the CWA. The pre-*Sackett* administrative edifice, built on a more relaxed understanding, shifted to conform. In September 2023, the Army Corps of Engineers (Corps) and the Environmental Protection Agency (EPA) issued a final rule revising the definition of "waters of the United States," including an "adjacent" wetlands provision modeled on *Sackett*. Revised Definition of "Waters of the United States"; Conforming, 88 Fed. Reg. 61964 (Sept. 8, 2023) (codified at 33 C.F.R. § 328.3 & 40 C.F.R. § 120.2) (the Amended Rule).

Plaintiff Robert White claims that the Corps and the EPA (the Agencies) did not faithfully implement *Sackett*'s test for adjacent wetlands because their definition omits a key element. He sued the Corps and the EPA under the Administrative Procedure Act, 5 U.S.C §§ 702, 706(2), to

set aside the allegedly unlawful Amended Rule. He now moves to preliminarily enjoin the Corps and the EPA from enforcing the Amended Rule against him and his properties. [DE 10]. Because White is unlikely to succeed on the merits, the Court denies his motion for preliminary injunction.

## BACKGROUND

Robert White is a relative latecomer to an issue that has frustrated federal courts since the early years of the CWA: Which wetlands are adjacent to, and thus considered part of, the "waters of the United States"? Before this Court lays out the facts relevant to White's motion, it is helpful to situate this dispute within the broader framework. The following introduces the CWA's statutory scheme, some of the administrative regulations that implement it, and the key Supreme Court decisions that have interpreted it.

## I.     The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA prohibits, among other things, "the discharge of pollutants by any person" into "navigable waters"—which it defines as "waters of the United States"—"[e]xcept as in compliance with the Act." 33 U.S.C. §§ 1311(a), 1362(7). The CWA defines "pollutants" broadly including not only those that spring to mind like "sewage, garbage . . . [and] radioactive materials" but also seemingly innocuous natural materials like "rock, sand, and cellar dirt." § 1362(6).

Discharging pollutants or otherwise failing to comply with the Act is no small matter. For even "inadvertent violations" can result in "crushing" consequences. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 602 (2016) (Kennedy, J., concurring). On the civil side, a single violation could result in a per day penalty of over $65,000. § 1319(b), (d); 28 U.S.C. § 2461 (note following); 40 C.F.R. § 19.4 (2023). On the criminal side, negligent violations can result in substantial fines and imprisonment for up to a year, and knowing violations double the fines and

2

increase the potential term of imprisonment to three years. § 1319(c)(1). Although the CWA charges the Corps and the EPA with administering and enforcing its provisions, the CWA also authorizes private parties to bring civil actions to enforce its provisions.[1] 33 U.S.C. § 1365.

To comply with the Act and take the severe penalties off the table, property owners can obtain a permit for the "discharge of dredged or fill material into the [waters of the United States] at specified disposal sites" from the Corps.[2] 33 U.S.C. § 1344(a). Obtaining a permit, however, is an expensive, time-consuming process. According to one study, applicants for specialized "individual" permits spend, on average, 788 days and $271,596 to complete the process without including additional costs for mitigation or design changes. *Rapanos v. United States*, 547 U.S. 715, 721 (2006) (plurality opinion). And that same study has applicant for "general" permits faring better in comparison but still spending, on average, 313 days and $28,915 to complete the permitting process. 547 US. at 721; *see also Hawkes*, 578 U.S. at 594–95 (relying on the study to detail "significant" costs of obtaining a permit).

Still the easiest way to avoid civil and criminal penalties is to not have any "waters of the United States" on your property. For that reason, the statutory term "waters of the United States" is key as it circumscribes the jurisdictional scope of the Act's substantive provisions. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't. of Def.*, 583 U.S. 109, 115 (2018). Yet it is not always easy to tell when a property contains jurisdictional waters. One available option for property owners is to ask the Corps to make the call by issuing a jurisdictional determination (JD). JDs come in two kinds— "preliminary" or "approved." 33 C.F.R. § 331.2 (2023). A preliminary JD merely "indicat[es] that

---

[1] Citizen suits under the CWA are limited to ongoing violations of the Act only. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 58–60(1987).

[2] Under § 1342, the EPA administers a separate permitting scheme, the National Pollutant Discharge Elimination System (NPDES), "as a means of achieving and enforcing the [CWA's] effluent limitations." *EPA v. California*, 426 U.S. 200, 205 (1976). The NPDES is not relevant here.

3

there *may* be water of the United States on a parcel . . . ." *Id.* Whereas, an approved JD "stat[es] the presence or absence of waters of the United States on a parcel . . . ." *Id.* Unlike their preliminary counterparts, approved JDs may be administratively appealed and constitute final agency action. *See Hawkes*, 578 U.S. at 595. If the approved JD is "negative," meaning the property doesn't have jurisdictional waters according to the Corps, the owner will enjoy a five-year safe harbor from the Agencies only; citizens may still sue for ongoing violations. *Id.* at 598–99. Of course, that means an "affirmative" approved JD not only blockades the five-year safe harbor but also puts the owner on notice "that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties." *Id.* at 599–600.

Property owners are not alone in their struggle to determine whether their property includes "waters of the United States." So too have the Agencies struggled to interpret that term. The Supreme Court has weighed in on the Agencies' interpretations several times, concluding once that the Agencies' interpretation was a reasonable interpretation and rejecting another interpretation as invalid. *Compare United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134 (1985) (holding that Corps's regulation exercising jurisdiction over adjacent wetlands was a "permissible interpretation" of its authority under the CWA), *with Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (*SWANCC*) (rejecting Corps's interpretation of it jurisdiction as extending to isolated intrastate ponds because those ponds served as migratory bird habitat).

The primary beneficiary of this "contentious and difficult [process]" of delineating the "waters of the United States" was the scope of the Agencies' jurisdiction. *See Nat'l Ass'n of Mfrs.*, 583 U.S. at 113. By the early 2000s, the Agencies "interpreted their jurisdiction over 'waters of the United States' to cover 270-to-300 million acres of swampy lands in the United States—

4

including half of Alaska and an area the size of California in the lower 48 States." *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (plurality opinion); *see also Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring) ("Unsurprisingly, the [Agencies] interpreted ["waters of the United States"] as an essentially limitless grant of authority.").

Outside of *SWANCC*, the "kudzu-like-creep" of the Agencies' jurisdiction over wetlands was unabated. *Cf. Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) (detailing the "kudzu-like-creep" of another doctrine). But attempts were made to conclusively exegete the statutory term "waters of United States." In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court considered the "waters of the United States" and its relationship to the the Agencies' jurisdiction over wetlands. Yet the Court did not reach a consensus "on precisely how to read Congress' limits on the reach of the Clean Water Act," leaving "[l]ower courts and regulated entities . . . to feel their way on a case-by-case basis." *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring).

Two competing approaches to the problem emerged from *Rapanos*. First, the plurality opinion authored by Justice Scalia posited that wetlands fall within "waters of the United States" if they (1) are adjacent to a relatively permanent body of water connected to traditional navigable waters and (2) are linked to that water through "a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins." 547 U.S. at 742 (plurality opinion). Viewing the plurality's approach as too restrictive, Justice Kennedy suggested instead that "the Corps'[s] jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and the navigable waters in the traditional sense." 547 U.S. at 779 (Kennedy, J., concurring). "Wetlands possess the requisite nexus" when they "significantly affect the chemical, physical, and biological integrity of other covered waters more

5

readily understood as navigable." *Id.* With neither opinion commanding a majority, the Agencies ran with the more jurisdictional friendly significant-nexus test. *See, e.g.*, Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37054, 37060–061 (June. 29, 2015).

Slightly under two decades after *Rapanos*, the Supreme Court picked an approach in *Sackett*, agreeing with the *Rapanos* plurality's "formulation of when wetlands are part of the waters of the United States." *Sackett*, 598 U.S. at 678. The Court held that "the CWA extends to only those wetlands with a continuous surface connection to bodies that are waters in their own right, so that they are indistinguishable from those waters." *Id.* at 684 (internal quotation marks omitted) (quoting *Rapanos*, 547 U.S. at 742). So the party asserting jurisdiction over an adjacent wetland must establish "first, that the adjacent body of water constitutes waters of the United States (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins." *Id.* at 678–79 (cleaned up) (citation and internal quotation marks omitted). Practically speaking, *Sackett*'s adoption of the continuous-surface-connection test tightened the definition of "waters of the United States" and narrowed the scope of federally regulable wetlands when compared with the significant-nexus test and the administrative regulations which implemented it.

Less than half a year before *Sackett* narrowed the extent of federally regulable wetlands, the Agencies published a final rule revising the definition of "waters of the United States." Revised Definition of "Waters of the United States", 88 Fed. Reg. 3004 (Jan. 18, 2023) (the 2023 Rule) (codified at 33 C.F.R. pt. 328, 40 C.F.R. pt. 120). But the 2023 Rule reflected the pre-*Sackett* status quo. As a result, when *Sackett* adopted the continuous-surface-connection test and jettisoned the

6

significant-nexus test, large swaths of the 2023 Rule became immediately inconsistent with the CWA's text.

The Agencies issued the Amended Rule in September 2023 to bring their definitions in line. Revised Definition of "Waters of the United States"; Conforming, 88 Fed. Reg 61964 (Sept. 8, 2023) (the Amended Rule) (codified at 33 C.F.R pt. 328 & 40 C.F.R pt 120). The Agencies' "sole purpose" in issuing the Amended Rule was "to amend these specific provisions of the 2023 Rule to conform with *Sackett*." 88 Fed. Reg. at 61964–65. The Amended Rule defines "waters of the United States" to include "Wetlands adjacent to" where "adjacent means having a continuous surface connection." 33 C.F.R. § 328.3(a)(4), (c)(2) (2023); 40 C.F.R. § 120.2(a)(4), (c)(2) (2023).

## II.    Robert White

Plaintiff Robert White owns properties in Pasquotank, Camden, and Currituck Counties. Parts of his properties are low-lying and some border the Pasquotank River, Big Flatty Creek, and other bodies of water that feed into the Albemarle Sound. White purchased the properties for his commercial seafood business, for agriculture, and for their long-term value as investments. He has big plans for his properties, and some are in motion. He has a crop-sharing arrangement with a local farmer and has a sand-mining permit; although, for reasons discussed later, he does not currently operate the mine and has limited his land under cultivation. Given White's expectations from his properties and their proximity to the bodies of water, he is unsurprisingly concerned about erosion. *See* [DE 1 ¶¶ 22–26].

Some of his efforts to control erosion on his properties attracted the Agencies' attention. In January 2023, the EPA, acting through the United States, brought a civil enforcement action

under the CWA, §§ 1311, 1319(b), against White [DE 24-6].[3] According to the United States, White discharged pollutants into jurisdictional waters without a permit when he constructed and filled linear bulkheads in open water and wetlands, both marsh and forested, at sites abutting the Pasquotank River and Big Flatty Creek. [DE 24-6 ¶¶ 20–28]. The Enforcement Action is ongoing with the deadline for dispositive motions approaching.

Last fall, White moved to stay the Enforcement Action pending the Agencies publication of the Amended Rule in September 2023. [DE 24-1 at 2]. He argued that a stay was necessary because of uncertainty surrounding the content of the then forthcoming Amend Rule. In an omnibus order entered on 4 December 2023, this Court denied White's motion on the grounds that the substance of the Amended Rule was known at that time and that White could raise a challenge to its application to his properties before the dispositive motion deadline. [DE 24-1 at 12–13].

Months after this Court denied White's motion to stay, White shifted from defense to offense. He filed this suit against the Agencies asserting two causes of action under Administrative Procedure Act (APA), 5 U.S.C. § 706(2). First, he alleges that the "adjacent" wetlands provision of the Amended Rule is inconsistent with *Sackett*'s test for jurisdiction over wetlands as derived from the text of the CWA. [DE 1 ¶¶ 145–47]. Accordingly, White asks this Court to hold the Amended Rule unlawful and set it aside under § 706(2)(A) of the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [DE 1 ¶ 148]. Second, White contends for those same reasons that the Amended Regulations exceed the Agencies statutory authority and must be set aside § 706(2)(C); what's more, he contends that through the "adjacent"

_____

[3] *See* United States Environmental Protection Agency v. White, 2:23-CV-0001-BO. Because the parties have filed the pertinent docket entries as exhibits in this action, the Court will cite to those exhibits for ease of reference.

wetlands provision the Agencies claim broad authority to exercise powers of vast economic and political significance without clear authorization from Congress. [DE 1 ¶¶151–56].

On 2 April 2024, White moved to preliminary enjoin the Agencies from enforcing the Amended Regulations as to him and his properties. [DE 10]. The Agencies and National Wildlife Federation and North Carolina Wildlife Federation (collectively, Wildlife Federations)[4] responded. [DE 24, 28-1]. The parties moved this Court to modify the briefing schedule and word limit to permit White to file one combined reply with a modestly enlarged word limit. [DE 34]. That request was granted. [DE 35]. White's Motion for Preliminary Injunction has been fully briefed. This Court held a hearing on 4 June 2024 where it heard argument from the parties. The motion, therefore, is ready for decision.

## DISCUSSION

Before addressing the merits of White's motion for a preliminary injunction, the Court must first consider the Agencies' assertion that this Court lacks subject-matter jurisdiction to hear White's challenge mainly because it is not ripe.[5]

### I.  Jurisdiction

"Because ripeness is a constitutional limitation on federal court jurisdiction, ripeness presents the threshold question whether a claim is justiciable." *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022). As with other justiciability doctrines, ripeness comes from Article III's case or controversy requirement. *Wild Va. v. Council on Env't Quality*, 56 F.4th 281,

---

[4] The Wildlife Federations intervened in this case as defendants. White initially opposed their intervention, but his position shifted. This Court granted the Wildlife Federations' motion to intervene after concluding they satisfied the requirements for permissive intervention under Rule 24(b). *See* [DE 35].

[5] At the hearing, the Agencies equivocated on this issue, indicating that it would prefer the Court deny White's motion on the merits rather than for non-justiciability. This Court, however, cannot equivocate when subject-matter jurisdiction is at issue.

293 (4th Cir. 2022); *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). A "bedrock requirement," justiciability keeps the judiciary in its proper role. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). So too with judicial review of administrative actions. For in that context, ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967).

To determine ripeness, federal courts must evaluate (1) the fitness of the issues for judicial decision and (2) the hardship of withholding court consideration. *Nat'l Park Hosp. Ass'n v. Dep't of the Int.*, 528 U.S. 804, 808 (2003). As with other matters of subject-matter jurisdiction, the plaintiff bears the burden of establishing ripeness. *See Whitaker*, 42 F.4th at 206.

White's challenge to the Amended Rule satisfies the fitness prong. "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (2006). White's complaint contends that the Amended Rule was not issued in accordance with law and exceeds the Agencies' statutory jurisdiction under the CWA. These are purely legal issues. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967) (recognizing that "whether the regulation is totally beyond the agency's power under the statute" "presents a purely legal question"). And, contrary to the Agencies assertions, the lawfulness (or not) of the challenged features of the Amended Rule "will not change from case to case or become clearer in a more concrete setting." *Nat. Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006).

10

The second ripeness prong, hardship to the parties, is also satisfied. An agency action causes hardship when it "create[s] adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Such effects include, commanding anyone to do anything or to refrain from doing anything; granting, withholding, or modify any formal legal license, power, or authority; subjecting anyone to civil or criminal liability; and creating legal rights or obligations. *Id.* at 733.

White has submitted a declaration detailing how the Amended Rule affects him and his properties. [DE 10-3]. Because of the Amended Rule and the Agencies' threat of additional enforcement actions, White has already taken concrete, definite action. He has, for example, ceased developing or operating his sand mine, thus tying up the $88,100.00 bond that conditions his permit. [DE 10-3 ¶¶ 7, 21]. White's crop-sharing arrangement has also been adversely affected. He has lost cropland—and revenue with it—in an effort to comply with the Amended Rule, and he has been unable to perform erosion control resulting, potentially, in the permanent loss of that cropland and its revenue. [DE 10-3 ¶¶22, 23].

Under the Amended Rule, White faces a trilemma: either (1) continue his activities and discharge fill material without a permit risking another EPA enforcement action, allowing him raise the defense that his land has no jurisdictional waters; or (2) ask the Corps the perform and approved JD and then choose between seeking judicial review if dissatisfied with the result or applying for a permit; or (3) go directly to the permitting process, hire expensive private consultants to have a fighting chance, and weather the indeterminate delays and significant expense.

White finds himself in a situation similar to those who suffered sufficient hardships for their disputes to be ripe. *See Abbott Lab'ys*, 387 U.S. at 152–53 (concluding dispute was ripe where

11

regulations had a "direct effect on the day-today business of [the regulated entities]"); *Gardner v. Toilet Goods Ass'n*, 387 U.S 169, 173–74 (1967). (finding ripeness where regulated entities were "placed in a quandary" between testing regulations through civil or criminal proceedings or submitting and facing substantial costs"). As with the industry plaintiffs in *National Ass'n of Home Builders v. United States Army Corps of Engineers*, 440 F.3d 549, 465 (D.C. Cir. 2006)—who faced the choice of applying for an permit based on activities they contended were outside the Corps's and EPA's authority or risking civil and criminal penalties—White will face hardship if denied judicial review of his challenge to the Amended Rule for he too will forced to pick between compliance and its accompanying costs or risking serious criminal or civil penalties for discharging pollutants.

The Agencies contend White states harms that are self-inflicted based on contingent, hypothetical agency action. The Court does not share the Agencies' view. To be sure, "future injur[ies] cannot be wholly speculative or rest upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Wild Va.*, 56 F.4th at 295 (citation and internal quotation marks omitted). Nothing is contingent about the Agencies view of their jurisdiction as codified in the Amended Rule. And, given that the Agencies enforcement action as to part of White's properties is ongoing, he has a credible threat that the Agencies will enforce the CWA against other parts of his properties should a violation occur there in the future. *Cf. Abbot v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) ("[T]he most obvious way to demonstrate a credible threat of enforcement in the future, of course, is an enforcement action in the past.").

The Agencies contend that any hardship to White can be ameliorated because he can seek a free jurisdictional determination. Not so. It is the Amended Regulations that open the door to the CWA's civil and criminal penalties not JDs or permits. Often those devices are how enforcement

12

actions and compliance orders begin. A landowner who suspected a water of the United States was on his or her property would be wise to get a JD before taking any action. But Landowners with wetlands on their property act towards those wetlands at their peril regardless of whether they seek a JD or not.

And, practically speaking, seeking a JD is not the remedy the Agencies think it is. The Corps does not consider itself obligated to issue JDs, and there is nothing White can do to compel the Corps to issue a JD, *see Mashni v. U.S Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 485 (D.S.C. 2021) (rejecting request to compel the Corps to issue a JD because "no law or regulation . . . imposes upon the Corps a duty to issue a JD upon a party's request). When the Corps gets around to issuing a JD for all of White's properties, he would either enter the five-year safe harbor from the Agencies but not citizen suits from private parties like the Wildlife Federations, or he would have to pursue the even more expensive and more time-consuming permit process.

At bottom, the ripeness doctrine poses no barrier to White's claims.[6] They do not rest on the assumption that the Agencies will exercise their authority under the Amended Rule unlawfully to White's detriment, but rather that the "*faithful* application [of the Amended Rule] would carry the Agencies beyond [their] statutory mandate." *Nat'l Ass'n of Home Builders*, 440 F.3d at 465.

The Agencies dovetail their ripeness argument with a similar argument that White's action fails to satisfy the § 704 requirement for APA review. Judicial review under the APA is reserved for "final agency action for which there is no other adequate remedy in a court." § 704. Those

---

[6] The Agencies asserted that White's hardship from the Amended Rule was so speculative as to deprive him of standing. "[I]n practice, there is an obvious overlap between" standing and ripeness. *Wild Va.*, 56 F.4th at 293 (cleaned up) (citation and internal quotation marks omitted). "Standing involves the question of *who* may sue, [while] ripeness involves *when* they may sue." *Id.* Because the "Article III standing and ripeness issues in this case boiled down to the same question," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014), that White has shown sufficient injuries for ripeness satisfies this Court that he has standing as well.

requirements for judicial review are jurisdictional. *See NAACP v. Bureau of the Census*, 945 F.3d 183, 189–92 (2019) (reaffirming and applying "the longstanding jurisdictional requirements . . . when proceeding under [§ 704 of] the APA"); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (concluding that failure to satisfy § 704 deprived the district court of subject matter jurisdiction)*; but see Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, (D.C. Cir. 2017) (remarking that § 704's requirements "determine whether there is a cause of action under the APA, not whether there is subject matter jurisdiction").

Essentially, the Agencies contend White has another adequate remedy to challenge the Amended Rule because he can raise his arguments as a defense in the enforcement action, and this action would be duplicative of that effort. The Agencies position is untenable. Section 704 was not intended as an additional device for federal courts to avoid review of agency actions; rather, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). There is nothing special about the CWA's procedures for review of agency actions, and the Supreme Court has held that parties don't have to wait for the EPA "to drop the hammer" in an enforcement action to seek judicial review of final agency action. *Sackett*, 566 U.S. at 127–131 (concluding that compliance order was final agency action and CWA's enforcement action provisions do not bar judicial review). And, as the Agencies admit, White is unable to challenge the Amended Rule compliance with the CWA's jurisdictional provision in the Enforcement Action. [DE 24 at 11].

In sum, neither the ripeness doctrine nor the APA preclude this Court from hearing White's claims that the "adjacent" wetlands provision of the Amended Rule is unlawful because it exceeds

14

the CWA's grant of authority. The Court, therefore, turns to the merits of White's request to for a preliminary injunction enjoining the Amended Rule.

## II.     White's Motion for Preliminary Injunction

A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm while a lawsuit is ongoing. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The burden on the party seeking a preliminary injunction is "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024)."To obtain the "extraordinary relief" of a preliminary junction, a plaintiff must establish the four so-called *Winter* factors: (1) that he is likely to success on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in his favor; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty*, 86 F.4th 537, 544 (2023) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)).

Although each of these factors must satisfied considered independently, *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013), failing to satisfy any of these factors allows the district court to deny preliminary injunctive relief without evaluating the remaining factors. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023); *see also Henderson for Nat. Lab. Rels Board v. Bluefield Hosp. Co., LLC*, 903 F.3d 342, 439 (4th Cir. 2018); *Frazier*, 86 F.4th at 544 ("*denying* a preliminary injunction only takes the rejection of a single factor.").

### A. White has not shown a likelihood of success on the merits.

White claims that the Amended Rule is unlawful and must be set aside under the APA, § 706(2), because Rule's "adjacent" wetlands definition—33 C.F.R. § 120.2(a)(4), (c)(2); 40 C.F.R. §328.3(a)(4), (c)(2)—contravenes *Sackett* and thus exceeds the Agencies authority under the CWA. While "a party is not required to prove his case to prove his case in full at a preliminary-injunction hearing," *Mahmoud*, 102 F.4th at 203 (cleaned up) (citation and internal quotation

15

marks omitted), "[a] plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed at trial," *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024). Accordingly, White must show clearly that his APA claims are likely to succeed. Because that boils down to the Amended Rule's fidelity to *Sackett*, the Court starts with that decision.

*Sackett* confronted a "nagging question about the outer reaches of the Clean Water Act," "attempted to identify with greater clarity what the Act means by "waters of the United States," and "decid[ed] the proper test for determining whether wetlands are "waters of the United States.' " 598 U.S. at 657, 663. The Court first resolved the geographical reach of "waters of the United States," concluding that "the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes.' " *Id.* at 671 (quoting *Rapanos*, 547 U.S. at 739). The Court then turned to where wetlands fit into that definition.

Although the ordinary meaning of "waters of the United States" would seem to categorically exclude wetlands—which like other areas in the "transition[al] [phase] from water to solid ground . . . are not wholly aquatic but nevertheless fall short of being dry land," *Riverside Bayview*, 474 U.S. at 132—the Court explained that the statutory context implies that at least some wetlands qualify as "waters" under § 1362(7). *Sackett*, 598 U.S. at 674–75. Some wetlands must qualify because § 1344(g)(1)—the CWA provision "which authorizes states to apply to the EPA for permission to administer programs to issue permits for the discharge of dredged or fill material into some bodies of water"—"presumes that certain wetlands constitute 'waters of the United States.' " *Id.* at 676.

Because knowing that CWA regulates some wetlands only gets you part of the way, the Court, moved on to answering the more difficult issue of which wetlands. Section 1344(g)(1) by

16

itself was of no use to the Court. That section does not define the CWA's reach because "it merely reflects Congress's assumption that certain adjacent wetlands are part of the CWA." Instead, the answer arose from "harmonizing" § 1344(g)(1)'s presumption of jurisdiction over certain wetlands with § 1362(7)' inherent limitations. *Id.* at 676. Specifically, the CWA covers wetlands that qualify as waters in their own right, which means they must be indistinguishably part of a body of water that itself constitutes "waters" under the CWA. *Id.* In effect, the requirement that a wetland be "indistinguishably part of otherwise covered 'waters of the United States' " harmonizes the inclusion of wetlands in § 1344(g)(1) with the definition of "waters of the United States in § 1362(7) by keeping the CWA limited only to "waters of the United States" while including adjacent wetlands. *Id.* And indistinguishability occurs "when wetlands have a 'continuous surface connection to bodies that are 'waters of the United States in the own right,' so that there is no clear demarcation between 'waters' and wetlands.' " *Id.* at 678 (quoting *Rapanos*, 547 U.S. 742 (plurality opinion)). Melding these requirements into one, the Court set forth a two-pronged test for adjacent wetlands:

> "the CWA extends to only those wetlands that are as a practical matter indistinguishable from waters of the United States. . . . [R]equir[ing] the party asserting jurisdiction over the adjacent wetland to establish first, that the adjacent body of waters constitutes waters of the United States. (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins."

*Id.* at 678–79 (cleaned up) (citations and internal quotation marks omitted).

Following *Sackett*, the Agencies issued the Amended Rule for the purpose of "conforming the 2023 Rule's definition of the term 'waters of the United States' to [*Sackett*]." 88 Fed. Reg. at 61964. The Agencies removed any reference to the significant-nexus standard and amended the definition of "adjacent" to "having a continuous surface connection." 88 Fed. Reg. at 61966; 33

17

C.F.R. § 328.3(c)(2); 40 C.F.R. § 120.2(c)(2). This definition, the Agencies and the Wildlife Federations maintain, conforms faithfully to *Sackett*.

White disagrees. He reads *Sackett* to hold that a continuous surface connection is necessary but not sufficient for a wetland to be practically indistinguishable and thus "adjacent" to a jurisdictional water. To White, a continuous surface connection is merely the first of two requirements for indistinguishability from a "water[] of the United States." Thus, to be "adjacent", a wetland must not only have (1) a continuous surface connection to a water of the United States but also be (2) practically indistinguishable from the water of the United States, such that it is difficult to determine where the water ends and the wetland begins. *See* [DE 1 at ¶145; DE 11 at 12] If it were otherwise—that is, if there was only the continuous surface connection requirement—indistinguishability would be "merely the logical outcome of the operative test . . . mak[ing] a wash of *Sackett*'s central holding." [DE 36 at 9].

The Court cannot square White's view of what *Sackett* requires of a wetland to be "adjacent" with what *Sackett* actually requires. The relationship between "practically indistinguishable" and "continuous surface connection" in *Sackett* is clear: for a wetland to be "as a practical matter indistinguishable from a water of the United States" . . . *requires* the party show "first, that the adjacent body of water constitutes 'waters of the United States' and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and where the 'wetland' begins." Put another way, a wetland with a continuous surface connection is a "water[] of the United States" *because* that continuous surface connection renders the wetland practically indistinguishable from the jurisdictional water to which it is connected. The continuous surface connection powers the test. Satisfying that first requirement adds nothing towards indistinguishability; the adjacent jurisdictional water is covered regardless

18

of its connection or proximity to a wetland. But the wetland only becomes practically indistinguishable from that water when it has a continuous surface connection because the connection makes it hard to tell where the covered water ends. Sever the continuous surface connection and the wetland, no matter how close its proximity, cannot be part of the "waters of the United States. *Id.* at 678 n.16 (noting "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction).

Although the Supreme Court has cautioned that "[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute," *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023), parsing *Sackett*'s holding drives home the relationship between a "continuous surface connection" and being "practically indistinguishable." Again, "the CWA extends to only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right,' *so* that they are indistinguishable from those waters." *Sackett*, at 1344 (internal quotation marks and citation omitted) (emphasis added). The use of "so" as a conjunction says it all. *So, American Heritage Dictionary* 1660 (5th ed. 2011) (meaning "[f]or that reason; therefore"); *so*, *Merriam-Webster's Collegiate Dictionary* 1182 (11th ed. 2003) (meaning "with the result that" or "for that reason").

Or, formulate the test as the *Rapanos* plurality did: " 'waters' may fairly be read to include only those wetlands that are 'as a practical matter indistinguishable from waters of the United States, . . . *that occurs when* wetlands have 'a continuous surface connection to bodies that are waters of the United States in their own right, so that there is no clear demarcation between waters and wetlands." *Sackett*, 1340 (quoting *Rapanos*, 547 U.S at 742, 755) (internal citation and quotation marks omitted) (emphasis added). Thus, whether using the phrasing from either *Rapanos*

19

or *Sackett*, the Court has stated in no uncertain terms that the consequence of a "continuous surface connection" with a covered water is indistinguishability with that water.

No lower court has read *Sackett* to mandate a wetland have both a continuous surface connection to a jurisdictional water *and* practically indistinguishable in order to be "adjacent." In *Lewis v. United States*, for example, the Fifth Circuit first acknowledged that *Sackett* requires the wetland be indistinguishable from a water of the United States to be jurisdictional but then continued to recognize that a continuous surface connection to jurisdictional water "represents the *Sackett* 'adjacency test.' " 88 F.4th 1073, 1078 (5th Cir. 2023). A similar pattern occurred in *Glynn Environmental Coal, Inc. v. Sea Island Acquisition, LLC*, where the United States District Court for the Southern District of Georgia also acknowledged that a wetland must be "practically indistinguishable" and then held that the property did not meet that definition *because* it failed the continuous surface connection test. 2024 WL 1088585, at *4–6, 2024 U.S. Dist. LEXIS 45704, at *11–16 (S.D. Ga. Mar. 1, 2024).

White contends that several background interpretative principles and rules of construction should lead this Court to reject the interpretation of the "waters of the United States" codified in the Amended Rule.

First, he argues that the Agencies' interpretation raises federalism concerns because the Amended Rule will allow them to regulate vast areas without a clear statement from Congress. Under that canon of construction, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020); *see also N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 298 (4th Cir. 2023) ("Congress must be explicitly clear if it wishes to alter the federal-state framework by

20

permitting federal encroachment upon a traditional state power. (citation and internal quotation marks omitted)).

This canon has molded the outcome of two key CWA cases. In *SWANCC*, the Court concluded that the Corps's "Migratory Bird Rule" exceeded their statutory authority partially because the Court "f[ound] nothing approaching a clear statement from Congress that it intended [the Corps's jurisdiction under] § 1344(a) to reach an abandoned sand and gravel pit." Likewise, the Court in *Sackett* invoked the federalism clear statement to highlight how the EPA' interpretation of § 1362(7) was "inconsistent with the text and structure of the CWA." *Sackett*, 598 U.S. at 679–80.

Second, he argues that the Amended Rule engenders serious doubts as to its constitutionality because of the nondelegation and due process concerns. Constitutional avoidance kicks in "where an otherwise acceptable construction of a statute would raise serious constitutional problems, [leading] [federal courts] [to] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575 (1988); *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022). The doctrine of constitutional avoidance is thus an interpretative tool available when a court confronts ambiguity and alternative interpretations, and thus it is inapplicable where there is no room for ambiguity because precedent precludes interpretation. *United States v. Wass*, 954 F.3d 184, 193–94 (2020). For that reason, constitutional avoidance has no role to play here. As discussed above, the Amended Rule faithfully conforms to *Sackett*'s interpretation of the "waters of the United States."

Still, going through the exercise does not change the bottom line—the Amended Rule suffers no constitutional infirmity either from the due process clause or federalism. How *Sackett*

21

used these background interpretative principles is dispositive of White's argument here. That is, the Court used the federalism canon and due process concerns to reject the EPA's interpretation after it had already defined the "waters of the United States" to include only those wetlands with a "continuous surface connection." *See Sackett*, 568 U.S. at 679–81. It would be a strange turn of events if the Court's interpretation was susceptible to the same faults. Thus, White's attempt to wield the federalism canon and due process against the regulations that faithfully embody that test is unavailing.[7]

Concerning nondelegation, there is no reason to doubt either *Sackett* or the Amended Rule on nondelegation grounds. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Granados v. Garland*, 17 F.4th 475, 480 (2021) (citation and internal quotation marks omitted) Yet not all delegations are constitutionally impermissible. "[A] delegation is constitutional so long as Congress has set out an 'intelligible principle' to guide the delegee's exercise of authority." *Gundy v. United States*, 588 U.S. 128, 145–46 (2019) (plurality opinion) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)). Put differently, "a delegation is permissible if Congress has made clear to the delegee the 'general policy' [it] must pursue and the 'boundaries of [its] authority." *Gundy*, 588 U.S. at 146 (plurality opinion) (quoting *American Power & Light v. SEC*, 329 U.S. 90, 105 (1946)).

White's nondelegation challenge is unpersuasive. The general policy of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" while balancing "the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(a)–(b). That is, to be sure, a broad policy. But a broad policy in line

---

[7] Even more to the point, White's competing interpretation raises serious due process concerns itself as it is hopelessly vague. What makes one wetland with a continuous surface connection "practically indistinguishable" where another would not be? White doesn't say.

22

with Congress's view of the CWA as a "self-consciously comprehensive" statutory scheme that effected a "total structuring and complete rewriting of the existing water pollution legislation" *Milwaukee v. Illinois*, 451 U.S. 304, 317–19 (1981). Congress has clearly outlined the policies the Agencies must pursue: "The [EPA] is authorized to prescribe such regulation as are necessary to carry out [its] functions" under the Act. § 1361(a); *see also Service Oil, Inc. v. EPA*, 590 F.3d 545, 549 (8th Cir. 2009) (describing EPA's rule-making authority as "broad"). The Corps is authorized to oversee permitting and to investigate and impose penalties on those who violate the CWA. §§ 1344, 1319(g)(1). Congress, moreover, has clearly defined the "boundaries of [the Agencies'] authority" through § 1362(7).

What's more, the Supreme Court's treatment of the CWA provides all the more reason to reject White's nondelegation arguments. The Court has never questioned whether Congress included an "intelligible principle" in the CWA, even where the Agencies have exceeded their statutory authority. *See SWANCC*, 531 U.S. at 172–74 (reading the CWA "to avoid significant constitutional and federalism questions" raised by an administrative interpretation at "the outer limits of Congress' power" but never questioning delegation of authority to agency); *Cf. Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) ("Given the broad, somewhat ambiguous, *but nonetheless clearly limiting terms*, Congress employed in the CWA, the Corps and the EPA would have plenty of room to operate." (emphasis added));

Finally, it is of no moment that the Amended Rule's preamble contains language that is arguably at odds with its text. As discussed above, the text of the Amended Rule is faithful to *Sackett*. And it is the text of the rule not the preamble that controls. *See Mejia-Velasquez v. Garland*, 26 F.4th 193, 202 (4th Cir. 2022) ("[T]o the extent there is a conflict between the preamble and the regulation, the regulation must control because a preamble cannot be read to

23

require more than the regulation requires."); *Alpha Venture Cap. Partners LP v. Pourhassan*, 30 F.4th 920, 926 (9th Cir. 2022) ("[W]hen a rule conflict with its own preamble, the rule controls.").

* * *

To summarize, White's challenge to the Amended Rule smacks up against the Rule's fidelity to "waters of the United States" and *Sackett*'s test to determine when an adjacent wetland meets that definition. White falters by isolating a phrase in *Sackett* from its logical connection to the remainder of the opinion. To apply Justice Holmes's familiar admonition to a different context: White is thinking words not things. The thing that makes a wetland practically indistinguishable from an adjacent "water[] of the United States" is the presence of a continuous surface connection. Thus, the Amended Rule faithfully conforms to the definition of "waters of the United States" as interpreted by *Sackett*.

White has failed to show that he is likely to succeed on the merits of either of his claims. And this failure to satisfy the first *Winter* factor is fatal to his motion. This Court will deny preliminary injunctive relief without evaluating the remaining *Winter* factors. *Vitkus*, 79 F.4th at 361; *see also, e.g.*, *JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 485 (E.D. Va. 2020) (denying injunctive relief for failure on the first *Winter* factor and not considering the remaining factors); *Manis v. U.S. Dep't of Agric.*, 2024 WL 1770775, at *8, 2024 U.S. Dist. LEXIS 74287, at * 20–21 (M.D.N.C. Apr. 24, 2024) (unpublished) (same).

CONCLUSION

For these reasons, Plaintiff Robert White's Motion for Preliminary Injunction, [DE 10], is DENIED.

SO ORDERED, this 17 day of June 2024.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE